UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - FLINT

FRED PARENT,
        Plaintiff,

vs.                                            CIVIL NO. 2:07-CV-12111

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,    HON. BERNARD A. FRIEDMAN
        Defendant                              MAG. JUDGE. STEVEN D. PEPE
_____/

**REPORT AND RECOMMENDATION**

**I.    BACKGROUND**

Fred Parent brought this action under 42 U.S.C. § 405(g) and §1383(c)(3) to challenge a final decision of the Commissioner denying his application for Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income (SSI) under Title XVI. Both parties have filed motions for summary judgment, which have been referred to the undersigned pursuant to 28 U.S.C. 636(b)(1)(B) and (C). For the following reasons, it is Recommended that Plaintiff's motion for summary judgment be DENIED and Defendant's motion for summary judgment be GRANTED.

    **A.    Procedural History**

Plaintiff applied for a period of disability and disability insurance benefits on October 7, 2002 and for Supplemental Security Income benefits on September 24, 2002, claiming an onset date of April 5, 2001 (R. 55-60). After Plaintiff's applications were initially denied, an administrative hearing was held on March 2, 2005, before ALJ Neil White at which Plaintiff was

1

represented by her current attorney, Mikel Lupisella. Vocational Expert (VE) Mary Williams also testified.

Plaintiff previously filed for SSI benefits on October 7, 2001 and for DIB on November 19, 2001 These claims were denied on April 24, 2002 and Plaintiff did not appeal. Because the two applications were less than a year apart, ALJ White reopened both of them pursuant to 20 CFR 404.988-989 and CFR 416.1488-1489. On April 22, 2005, ALJ White decided Plaintiff was not under a disability at any time through the date of the decision because, despite his impairments, he could perform his past relevant work as an assembly line worker (R. 19-25). This became the Commissioner's final decision when Appeals Council denied Plaintiff's request for review (R. 5-7).

### B. Background Facts

#### 1. *Plaintiff's Testimony*

Plaintiff was born on January 21, 1968, and was 33 years old at his alleged onset of disability (R. 62). He was in special education and finished 10th grade with limited reading and writing abilities (R. 318-319). In his *Disability Report* Plaintiff indicated he could speak and read English, but was only able to write "some" English (R. 102). Plaintiff claimed that his conditions that limit his ability to work are an injured knee and a learning disability in reading, writing, spelling and math (R. 103).

Plaintiff lives with his wife and three daughters (R. 318). Plaintiff's parents filled out one of his *Daily Activity Sheet*, the other one was filled out by Ralph Moore, a friend of his father. Both sheets indicate that he likes to trap, hunt, fish and go to dog shows, with his special hobby being tanning hides (R. 85, 120). Plaintiff has two friends and is close with his family with whom he goes out to eat or to a movie (R. 86, 121).

Although Plaintiff drives daily, it does make his knee hurt (R. 87). Plaintiff is able to do weekly household chores like cleaning the house, cooking and fixing things. On a daily basis, he is capable of grooming and bathing himself, watching the children and reading, though not well (R. 87, 122). Also, Plaintiff participates in the Lapeer and Millington coon clubs but does not hunt as often as he would like (R. 87, 122). He is able to pay bills and handle finances (R. 88, 123).

Plaintiff's most recently an assembler job with Lear (R. 142). Before that he worked at various factory jobs – steel cutter, sorter and vegetable canner – and as a farmer picking pickles (R.112-118, 142). His earnings record shows seven years of low hourly wages ranging from $4.50 to $8.00 (R. 113-118).

Plaintiff lives with his wife, three daughters and mother-in-law (R. 318). He testified that his knee gives him a lot of pain interfering with his ability to obtain a good night's sleep. Compounding the sleep problem, the pain medication prescribed for him makes him sleepy (R. 320).

### 2. *Medical Evidence*

#### a. **Evidence of Physical Impairments**

On January 21, 2001, Plaintiff was seen by Nasser Taghavi, M.D. in the emergency room after he slipped and fell on ice and injured his left knee (R. 150-51). Preliminary readings of the x-rays of the left knee were negative for fractures or dislocation. Dr. Taghavi prescribed Tylenol #3 and crutches for at least three weeks instructing him to follow-up with either a family physician or possibly an orthopedic surgeon (R. 151).

Plaintiff followed up with Byron C. Chamberlain, M.D., and on May 15, 2001, Dr. Chamberlain performed a surgical reconstruction of the left knee anterior cruciate ligament and a

3

medial meniscus repair (R. 154-165). On December 26, 2001, Dr. Chamberlain performed arthroscopic surgery of the left knee (R. 162). On February 4, 2002, Plaintiff complained that his knee was no better than prior to the surgery (R. 166). Upon examination, Dr. Chamberlain found there to be some swelling in the knee and that Plaintiff could extend to about 5 degrees from flexion and flex to 115 degrees (R. 166). He noted that the arthroscopic findings showed a tear that they excised, but the overall cartilage appeared in excellent condition, and the ACL appeared "quite well" (R. 166). His impression was "mild degeneration in the medial compartment, which [was] very minimal, some subjective patellofemoral pain, and perhaps some residual swelling and tenderness from the medial meniscectomy and surgery" (R. 166). Dr. Chamberlain advised a rehabilitative exercise program and expected improvement. He stated that he could not "find any objective reason why [Plaintiff] should be having such significant pain" (R. 166). He also stated that Plaintiff asked him to complete a form indicating that he had been disabled from his initial surgery in May of 2001 to the day of the visit in February 2002. The doctor indicated that he was not sure he could put him on disability for that long and that he did "not feel that [he could] justify complete disability in the future" (R. 166).

From April 2001 through February 2002, Plaintiff engaged in physical therapy to gain strength and flexibility in his knee (R. 195-233).

On April 18, 2002, a state agency physician a Dr. Thomas, reviewed the medial record (R. 234-41). Dr. Thomas noted the history of knee surgeries and mild degenerative arthritis (R. 234). He found that Plaintiff was capable of performing work lifting 20 pounds occasionally and 10 pounds frequently with postural limitations to avoid climbing ramps and stairs and crawling (R. 235-6). He could sit and stand for 6 hours in an 8-hour day. Dr. Thomas concluded that his opinion was consistent with the conclusion of the treating orthopedic surgeon, Dr. Chamberlain,

4

making specific notations of Dr. Chamberlain's findings (R. 240). Taking into account a review of all the evidence in the file, the physician assessed Plaintiff's residual functional capacity to be a restricted range of light work acknowledging a limitation in the Plaintiff's lower extremities (R. 235).

On January 17, 2003, Vipin Khetarpal, M.D., performed a consultative evaluation at the request of the state agency (R. 250-55). Plaintiff stated that he had not had much relief since his surgery and could not stand for more than 10-15 minutes (R. 251). After an examination of the left knee, the doctor concluded there was "no evidence of any restriction or pain or joint instability" (R. 252).

On February 27, 2003, Dr. L. G. Thompson, M.D., a state agency physician, reviewed the record performing an evaluation for the period of April 5, 2001 to present (the February 27th date) (R. 275-82). He found that Plaintiff was capable of performing work lifting 50 pounds occasionally and 25 pounds frequently with no postural limitations or environmental limitations (R. 276). Referring to Dr. Khetarpal's report (R. 276, 280), Dr. Thompson concluded that Plaintiff could perform medium work (R. 275-82).

On June 19, 2003, Plaintiff started treatment at the Knee and Orthopedic Center for crepitus, grinding and pain in his left knee (R. 305-07). The knee was examined and found to be have normal strength and tone (R. 305). Plaintiff was treated conservatively with medication and a new knee brace (R. 303-04). He declined further physical therapy (R. 303). A month later, on July 22, 2003, Plaintiff reported that these measures were helping with his pain, and he was able to walk more effectively (R. 300). On November 4, 2003, the doctor indicated that he wanted Plaintiff to decrease Vicodin medication (R. 299). Several unsuccessful attempts were made to contact Plaintiff in the ensuing months to schedule follow-up appointments but to no

avail (R. 299). Plaintiff returned to the clinic more than a half a year later on May 27, 2004, reporting instability of the left knee when walking on uneven surfaces. The physical examination showed a stable ACL and medial joint tenderness (R. 299).

An MRI performed a few weeks later showed tears in the left lateral and medial menisci. In response to these findings, Dr. Gordon A. McClimans, on July 23, 2004, performed arthroscopic surgery to Plaintiff's left knee (R. 296; see R. 293-94). On August 5, 2004, during a follow-up appointment, Plaintiff told his surgeon that he had less pain than prior to the surgery and was happy with his care (R. 296). A few weeks later, on August 28, 2004, Plaintiff started to complain about right knee pain with no mention of pain to his left knee (R. 312).

### b. Evidence of Mental Impairments

Dr. Khetarpal, during the medical examination of Plaintiff's knee, examined Plaintiff for cognitive impairments, noting that Plaintiff attended special education classes since kindergarten and dropped out of school during eleventh grade (R. 251). There was no self reporting of delusions, hallucinations, depression, suicidal attempts or persecutory ideations. In his conclusion, Dr. Khetarpal recorded his observations of Plaintiff having a somewhat flat affect and slow mentation with poor recall of dates and events. To further investigate these observations, Dr. Khetarpal recommended a detailed psychological test (R. 252).

On January 13, 2003, Margaret K. Cappone, Ph.D., performed an intellectual evaluation at the request of the state agency who diagnosed Plaintiff with Borderline Intellectual Functioning (R. 245-49). Dr. Cappone administered the Wechsler Adult Intelligence Scale test and found Plaintiff had a Verbal Scale Standard Score of 70, Performance Scale Standard Score of 78, with a Full Scale Standard Score of 72, placing him the in the borderline range of intellectual functioning (R. 246). Dr. Cappone wrote that Plaintiff's Verbal Comprehension

Index indicated borderline ability to process verbal information and significant trouble with numerical reasoning and solving simple mathematical problems without the assistance of paper and pencil (R. 246). His hands-on mechanical skills and perceptual organization skills were in the average range. Dr. Cappone noted that he maintained good interest, motivation and persistence during the testing (R. 246).

On February 10, 2003, a Psychiatric Review Technique form was completed by Ronald C. Marshall, Ph.D. (R. 256-7). Dr. Marshall found on the "B" Criteria that Plaintiff had mild limitations on his activities of daily living and in maintaining social functioning and moderate limitations in maintaining concentration, persistence and pace (R. 266). There was no reviewer evidence of the "C" Criteria (R. 267). A Mental Residual Functional Capacity Assessment was also completed by Dr. Marshall in which it was determined that Plaintiff was moderately limited in his ability to:

1. carry out detailed instructions;
2. understand and remember detailed instructions and
3. maintain attention and concentration for extended periods.

(R. 271). He found no significant limitations in all other areas of Plaintiff's functioning (e.g. in the ability to remember locations and work-like procedures; understand and remember very short and simple instructions; and carry out very short and simple instructions) (R. 271). In conclusion, he felt that Plaintiff would have difficulty with complex technical tasks but retained the ability to perform unskilled tasks on a sustained basis (R. 273).

### 3. *Vocational Evidence*

The Vocational Expert (VE) Mary Williams testified at the March 2005 administrative hearing. ALJ White asked VE Williams to review Plaintiff's background (R. 323). VE Williams testified that Plaintiff's past relevant work was unskilled light to medium work as an assembler, sorter,

and saw operator (R. 323). ALJ White then asked VE Williams to assume a hypothetical person of Plaintiff's age, education, work experience and who was limited to simple, repetitive work involving no more than one-, two-, and three-step tasks; could operate a motor vehicle; and could lift up to 20 pounds occasionally and ten pounds frequently (R. 323-4). The VE testified that this individual could perform Plaintiff's past relevant work as an assembly line worker (R. 324). Such a person would be precluded from the past work if the job required them to either remain seated throughout the shift or standing for up to six hours a day. With a sit/stand option, this individual could perform light work as an inspector (6,000 jobs), sorter (1,500 jobs), and assembler (18,000 jobs) (R. 324).

In response to Plaintiff's attorney's question, the VE testified that such an individual who required lying down for two to three hours a day or needed to nap up to two times a day would be precluded from work (R. 324-5). Further that the hypothetical individual, if he were unable to sustain concentration, persistence or pace to timely complete tasks for about 30% of the work day, would also be precluded from employment (R. 325).

### 4. *The ALJ's Decision*

ALJ White found that Plaintiff met the non-disability requirements and was insured for benefits through the date of his decision (R. 24).

Plaintiff had the following severe impairments: lateral and medial menisci tears, cruciate ligament tear, residuals from surgery to repair these problems and borderline intellectual functioning. These impairments individually or in combination were not "severe" enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, or Regulations No. 4 (R. 25).

The ALJ did not find Plaintiff's allegations regarding his limitations wholly credible (R.

24). The ALJ determined Plaintiff to have the residual functional capacity (RFC) to perform a limited range of light work that did not involve more than simple, repetitive tasks with one-, two-, and three-step instructions. Plaintiff's past work as an assembly line worker did not require the performance of work-related activities precluded by his RFC, and he was not prevented from performing this past relevant work and, therefore, he was not disabled (R. 24-25).

## II. ANALYSIS

### A. Standards of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

If the Commissioner seeks to rely on vocational expert testimony to carry his burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than his past work, the testimony must be given in response to a hypothetical question that accurately

describes Plaintiff in all significant, relevant respects.[1] A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

B. **Factual Analysis**

1. *Hypothetical Question*

Plaintiff asserts that in determining that he could perform a significant number of jobs, the ALJ relied on a deficient hypothetical question to the VE because it suffered from an improper determination of Plaintiff's residual functional capacity (RFC) and from failing to give full credence to Plaintiff's accounts of pain and limitations. Contrary to Plaintiff's claim, the hypothetical questions the ALJ asked the VE, and the corresponding answers the ALJ relied on, were adequate because they included all of Plaintiff's substantiated impairments and resultant limitations. The ALJ may pose hypothetical questions to the VE which include only those limitations which the ALJ finds credible. *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993).

Plaintiff's challenge to the hypothetical question is based in part to the ALJ's credibility finding as not supported by the record because it failed to adequately assess Plaintiff's subjective estimation of his pain. Subjective evidence is only considered to "the extent [it] can reasonably be accepted as consistent with the objective medical evidence and other evidence" (20 C.F.R.

---

[1] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

404.1529(a)) (*See Young v. Secretary of Health & Human Servs.,* 925 F.2d 146, 150-51 (6th Cir. 1990); *Duncan v. Secretary,* 801 F.2d 847, 852 (6th Cir. 1986) (Subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record that would explain such pain). The issue of a claimant's credibility regarding subjective complaints is largely within the scope of the ALJ's fact finding discretion – the Commissioner's "zone of choice" – if adequately explained and supported by the record.

The ALJ is not required to accept a claimant's own testimony regarding allegations of disabling pain when such testimony is not supported by the record. *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). The ALJ must, however, do more than say the testimony is not credible based on generalities or merely recount the medical evidence and claimant's daily activities and then without analysis summarily conclude that the overall evidence does not contain the requisite clinical, diagnostic or laboratory findings to substantiate the claimant's testimony regarding pain. *Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994). In order for an ALJ to properly discredit a claimant's subjective testimony, the credibility determination must be accompanied by a detailed statement explaining the ALJ's reasons. S.S.R. 96-7p directs that findings on credibility cannot be general and conclusory findings, but rather they must be specific.

ALJ White determined that Plaintiff's allegations were not "wholly credible because they were not supported by the objective medical evidence and other evidence of record" (R. 22). This is insufficient without identifying that evidence referred to, yet immediately after this statement ALJ White returns to discuss Dr. Chamberlain, and Plaintiff's most significant surgery his ACL reconstruction in May 2001 to his left knee (R. 154-57). The ALJ notes Plaintiff did

11

well and got a work release with restrictions (R. 22). In a subsequent follow-up appointment of February 2002, the surgeon, Dr. Chamberlain, could not find any objective basis to explain Plaintiff's continuing complaints of pain because they were inconsistent with his examination findings (R. 166). Plaintiff's knee injury and subsequent surgeries, although severe, are not sufficient to support a claim for disability. He must show that the condition has a disabling effect on his ability to work regularly. Plaintiff asked Dr. Chamberlain to complete a form indicating that he had been disabled from his initial surgery in May of 2001 to the day of the visit in February 2002. The doctor indicated that he was not sure he could put him on disability for that long and that he did "not feel that [he could] justify complete disability in the future" (R. 166). ALJ White specifically quotes these misgivings of Dr. Chamberlain. A second procedure was performed in July 2004 to Plaintiff's knee, which was arthroscopic and exploratory with results showing negative findings (R. 293-74, 296). One month after this procedure, Plaintiff started to complain about right knee pain with no mention of pain to his left knee (R. 311-13).

Dr. Khetarpal examined Plaintiff's knee on January 17, 2003, concluding there was "no evidence of any restriction or pain or joint instability" (R. 252). A month later, Dr. Thompson evaluated Plaintiff's physical capabilities for the period of April 5, 2001 to February 27, 2003, the date of the exam (R. 275-82). He found that Plaintiff was capable of performing work lifting 50 pounds occasionally and 25 pounds frequently with no postural limitations or environmental limitations (R. 276). Consistent with Dr. Khetarpal's findings, Dr. Thompson concluded that Plaintiff could perform medium work (R. 275-82). Thus, there are specific medical records that would support the ALJ's doubts as to Plaintiff's credibility.

In regards to Plaintiff's mental disability and the RFC determination, ALJ White concluded that Plaintiff's I.Q. testing was consistent with borderline intellectual function. This

limitation only mild impaired Plaintiff's abilities to perform activities of daily living, maintain social functioning and concentration, persistence and pace. Dr. Marshall, the examining psychologist for DDS found no significant limitations Plaintiff's ability to remember locations and work-like procedures; understand and remember very short and simple instructions; and carry out very short and simple instructions (R. 271). In his conclusion, he felt that Plaintiff would have difficulty with complex technical tasks but retained the ability to perform unskilled tasks on a sustained basis (R. 273).

Based on the above evidence, ALJ White asked VE Williams to assume a hypothetical person of Plaintiff's age, education, work experience and who was limited to simple, repetitive work involving no more than one-, two-, and three-step tasks; could operate a motor vehicle; and could lift up to 20 pounds occasionally and ten pounds frequently (R. 323-4). The VE testified that this individual could perform Plaintiff's past relevant work as an assembly line worker (R. 324). With a sit/stand option to accommodate Plaintiff's reported need to stretch, this individual could perform light work as an inspector, sorter, and assembler. All three jobs exist in significant numbers in the economy (R. 324).

The hypothetical question the ALJ asked the VE, and the corresponding answer the ALJ relied on, was adequate and proper because it included all of Plaintiff's substantiated impairments and resultant limitations. Therefore, the effects the knee injury and mental impairments had on Plaintiff's ability to work was included in the ALJ's RFC. *See* 20 C.F.R. § 404.1527(f)(2)(I) (requiring the ALJ to consider opinions from agency physicians who are also experts in Social Security Disability); *Wyatt v. Sec. of HHS*, 974 F.2d 680, 686 (6th Cir. 1992). Based on the record and his credibility findings, the ALJ was within a reasonable range of discretion in not taking all alleged limitations as disabling. His failure to label Plaintiff's

13

condition as "severe" is not reversible error.

## 2. Listing 12.05(C) Impairment

Plaintiff argues that this case be remanded with an award of benefits because Plaintiff's impairment meets Listing 12.05(C). To meet Listing 12.05C, a claimant must show:

> (1) a valid verbal, performance, or full scale IQ of 60 through 70;
> (2) an onset of the impairment before age 22; and
> (3) a physical or other mental impairment imposing an additional
>     and significant work-related limitation of function.

*Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006) (emphasis supplied.)

Plaintiff argues that because his verbal IQ test score was 70 and he has physical impairments that impose additional and significant work-related limitation of function, to wit: "'lateral and medial menisci tears, cruciate ligament tear and residuals from surgery to repair these problems'" he meets Listing 12.05(C) (Dkt. # 10, p. 13).

Plaintiff satisfies the first prong of Listing 12.05(C) because introduced in evidence was a valid IQ test showing that his verbal IQ was 70. The next prong of the Listing, a showing that this impairment had an onset before age 22 is not as clear. The introductory paragraph of Listing 12.05 states: "mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22". Therefore, as stated earlier, Listing 12.05 is met only if one's "impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria". 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(A); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) ("A claimant must demonstrate that her impairment satisfies the diagnostic description for the

listed impairment in order to be found disabled thereunder".). *Foster* cites this provision in noting that a "claimant must demonstrate that her impairment satisfies the diagnostic description for the listed impairment in order to be found disabled thereunder". Here that requires finding:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22

*Foster* found insufficient proof of mental retardation prior to age 22. Here there are no IQ scores submitted indicating Plaintiff suffered from mental retardation prior to his 22nd birthday. Thus one could say that Plaintiff does not meet the "diagnostic description in the introductory paragraph " of 12:05, and no further analysis under subparagraphs C is required.

*Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006), however, notes that

> this court disagrees with the Commissioner that the Listing's introductory paragraph requires a formal diagnosis of mental retardation . . . .

The Eighth Circuit has done away with the requirement of a formal diagnosis of mental retardation. *Id.* (8th Cir. 2006)(see also *King v. Barnhart*, 2007 W.L. 968746 (S.D.Ind 2007)). It is presumed that a persons's I.Q. remains stable over time in the absence of any significant change. *Maresh* at 900. Assuming the Sixth Circuit would agree with the Eighth Circuit that a formal diagnosis of "mental retardation" is not required, there still remains the requirement noted in *Foster* of "subaverage intellectual functioning with deficits in adaptive functioning before Age 22." Dr. Cappone acknowledged that Plaintiff's IQ scores placed him in the borderline intellectual functioning range, with a Verbal IQ of 70 . Also, in Plaintiff's early school years he was in special education classes. Even without a showing as to the basis for the placement in special education, it could be presumed from the placement coupled with the subsequent IQ test,

15

that Plaintiff suffered from a low intellectual quotient prior to his 22nd birthday.[2] Yet, as in *Foster* there is no evidence of deficits in adaptive functioning prior to Age 22. ALJ White noted Plaintiff's ability to work for many years with his mental limitations (R. 25). He noted Plaintiff's limitations were with reading. The record shows he plays cards, drives, pays bills and handles his own finances (R. 88). His past work experience and these other abilities may explain why ALJ White found only mild limitations in concentration, persistence and pace (R. 23), unlike Dr. Marshall who found them "moderate" (R. 256).[3]

Thus, in the absence of an additional proof of adaptive limitations prior to age 22, there is substantial evidence to uphold ALJ White's finding that Plaintiff does not meet Listing 12.05(C).

### III. RECOMMENDATION

For the reasons stated above, it is Recommended that Plaintiff's Motion for Summary Judgment be DENIED, Defendant's Motion for Summary Judgment be GRANTED. Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and

---

[2] Apparently all of Plaintiff's high school records other than his transcript were destroyed after five years (R. 246).

[3] Plaintiff questioned why ALJ White did not adopt psychologist Marshall's moderate finding on concentration, persistence and pace. Dr. Marshall does not appear to have seen Plaintiff as did the ALJ. He categorized Plaintiff's mental impairment as an organic mental disorder (12.02) not mental retardation (12.03) (R. 256-57). Although he failed to note the basis on R. 257, all the other categorizations on this cryptic report of Dr. Marshall were "mild or "none" (R. 266) (See also R. 271-273). Plaintiff did not claim disability initially due to any problem other than his left leg (R. 67). His lawyer argued to the appeals council that Plaintiff met 12.02, not 12.03, based on below average memory (R. 11, referring to R. 246). He gives no other record reference supporting this. Dr. Cappone specifically noted Plaintiff was persistent and motivated and that this attention and concentration during testing were fair (R. 246). Based on this record there is no justification to disturb ALJ White's finding of mild impairments of concentration, persistence and pace. ALJ White found that Plaintiff could perform his past assembly line work that he had performed successfully in the past notwithstanding any limitations with concentration.

E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Filing of objections, which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs .*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: March 28, 2008.                  s/Steven D. Pepe

Ann Arbor, Michigan                 United States Magistrate Judge

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing *Report and Recommendation* was served on the attorneys and/or parties of record by electronic means or U.S. Mail on March 28, 2008.

                s/ Alissa Greer
                Case Manager to Magistrate
                Judge Steven D. Pepe
                (734) 741-2298